CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

NOV 20 2009

JOHN F. CORCORAN, CLERK
BY: /s/ _____ DEPUTY CLERK

7:09-CV-00477

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

BARISH- STERN LTD. on Behalf of Itself, Plaintiff,

v.

STARTLOGIC CORPORATION, Defendant.

### COMPLAINT

Plaintiff, Barish- Stern Ltd. ("Plaintiff" or Barish- Stern ), by Francine R. Bray , on behalf of itself alleges the following facts and claims upon knowledge as to matters relating to itself by way of this Complaint, avers as follows:

### INTRODUCTION AND SUMMARY OF ACTION

1. Plaintiff brings this action on behalf of itself situated or located in the State of Virginia against Defendant, Startlogic Corporation. ("Defendant" or "STARTLOGIC"), to obtain, *inter alia,* damages and injunctive relief under the Virginia Deceptive Trade Practices Act, as well as the common law, and ethics and established proper business practices regarding doing business on the Internet and United State Copyright Act. as defined below.

2. The Action states that Plaintiff, residing or located in the State of Virginia, otherwise relied upon STARTLOGIC to perform services that have suffered damages as a result of violation of intellectual property laws, breach of contract and theft and ransom for virtual personal property and web-site hosting violations in which STARTLOGIC persistent failure to be responsible and provide timely, attentive and responsible customer service and technical assistance, including, but not limited to, deliberately closing down my web site and not allowing me access to my files, web site name or any other aspects of my web-site that would enable me to continue to do business on the internet. STARTLOGIC as part of a policy and practice by STARTLOGIC to discourage parties from raising legitimate grievances with STARTLOGIC, would not allow me access until I agreed to resolve SEO, (Search Engine Optimization) issues with them on their terms, which violated my rights and removed my property from my grasp and put all rights to it with STARTLOGIC.

3. As explained fully below, upon information and belief, at all pertinent times, Defendant has repeatedly failed to comply with its obligations under Virginia law, by, *inter alia,* deliberately refusing to conform its conduct to established trade practice in its industry in order to maximize its profits at the expense of its customers and third parties. Specifically, as explained fully below, STARTLOGIC has pursued a policy and practice providing web site hosting and then through addition of services or other means, violates owners rights, charges for work not done and, deliberately avoids responsibility for its own misconduct and failing to adequately or timely remedy these situations, even when it is

aware of such violations. Upon information and belief, STARTLOGIC has pursued these policies and practices in order to boost short-term revenues and profits at the expense of its customers and business associates that rely upon services provided to them by STARTLOGIC.

**PARTIES**

4. Plaintiff is and, at all times relevant to this action, has been a resident of the State of Virginia.

5. Defendant is and, at all times relevant to this action, has been an Arizona corporation with its principal place of business at 919 E. Jefferson St. Ste.100, Phoenix, AZ 85034 . Defendant's registered agent for service of process is CT CORPORATION SYSTEM. The Defendant's Physical Address is 2394 E CAMELBACK RD PHOENIX, AZ 85016 Defendant was created in 2003 by THOMAS GORNY CHIEF EXECUTIVE OFFICER, and a sister company IPowerWeb also at this address, both believed to be a part of Endurance International STARTLOGIC is also hereby defined to include all entities acquired by or otherwise purchased by Defendant prior to and during the Period (defined below).

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction pursuant to *28 U.S.C. § 1332*(d)(2) because the matter in controversy, upon information and belief, exceeds 75,000 exclusive of interest and costs, and this is an action in which Defendant are citizens of different states. In addition, the amount in controversy between Plaintiff and Defendant, upon information and belief, exceeds $ 75,000, exclusive of interest and costs and, as a result, jurisdiction also exists over this action pursuant to *28 U.S.C. § 1332*(a).

7. Venue is proper in this judicial district pursuant to *28 U.S.C. § 1391* because [*5] Defendant does business throughout this district, and many of the acts complained of took place within this district. In addition, the Plantiff currently resides or is located in this judicial district.

**FACTUAL BACKGROUND**

8. Barish-Stern is an established and highly respected company located in Troutville, Virginia.

9. Barish-Stern has a history of establishing and maintaining successful working relationships with a number of business partners, including STARTLOGIC and its predecessors. Furthermore, in the past, Barish-Stern has recommended certain services offered by STARTLOGIC and its predecessors to certain of its customers.

10. STARTLOGIC is a self-described competitive web-hosting company providing internet hosting, SEO (Search Engine Optimization) services, Domain Name Registrations, and web building, Internet services to more than 100,000 small and mid-sized businesses, and private customers in a cyberspace atmosphere. STARTLOGIC also offers its customers web hosting and site design services.

11. In February 2007, Barish-Stern's principal Francine Bray was approached by Startlogic's James Plascio SEO manager, with their proposal to increase their web-site sales by driving customers to their site that would convert to sales; visitor to closure traffic ratio guaranteed to increase by three percent (3% ). Barish-Stern considered the time and

dollars, ($1500.00 total commitment over a one year period to be a worthwhile investment based solely on the SEO guarantee of three percent (3%) increase in sales closure.

12. Based upon its past relations and business dealings with STARTLOGIC, Barish-Stern agreed to STARTLOGIC beginning the process and performing certain services . Barish-Stern specifically presented a detailed statement to Startlogic of what Francine Bray had already done and was told these services would not be duplicated. Pursuant to which, Startlogic was to begin SEO work on Barish -Stern's web-site: www.artongoldgallery.com.

13. After presenting this plan to Barish-Stern a partial payment of $300.00 toward a contract price of $1500.00 was agreed upon for Startlogic to begin work and to show Barish-Stern what could be done to create the guaranteed three percent (3%) sales closure traffic.  The $300.00 payment was made through Francine Bray's Chase Credit Card account.

14. Barish-Stern never heard from James Plascio again.  During the next three (3) month period it became obvious that STARTLOGIC was only duplicating all the work Barish-Stern had already done and the new SEO person at STARTLOGIC, Louis Obando, stated that what we wanted, they weren't able to do.  After that we attempted to have someone from STARTLOGIC contact us to discuss this and did not hear anything back.

15. Barish-Stern alerted STARTLOGIC technical support as to the nature of this situation and worked diligently to have the situation rectified, but STARTLOGIC did not see fit to answer any of my numerous calls or requests.

16.  On May 9, 2007, STARTLOGIC automatically charged Barish-Stern's credit card account for a one (1) year renewal for web hosting services.  By mid-May after numerous call and emails,  Barish-Stern was able to finally determine that only an SEO manager could do anything and contacted a Mr. Gonzales at STARTLOGIC.  Again, after numerous attempts by phone and email, to Mr. Gonzales, Francine Bray contacted the credit card company, (Chase), and had the three hundred, ($300.00), charge for the SEO service reversed.  Barish-Stern also promptly notified STARTLOGIC technical support as to the nature of this situation.

17. Rather than responding in a responsible and competent manner, however, STARTLOGIC, without any communication, closed down our web site (www.artongoldgallery.com,) and all access to our files.

18. In response to this situation, Barish-Stern's  operations on the internet were compromised and Francine Bray immediately requested that a high level STARTLOGIC person examine the situation and return the web site, which they hosted, and was paid for, in full , to be re-instated. After additional investigation, Francine Bray spoke to Marie in billing and was directed immediately to Mr. Gonzales. He stated, James Plascio, who represented STARTLOGIC and entered into the contract with Barish-Stern, with a guarantee of sales, overstated would could be done! Mr. Gonzales said they would re-instate the web-site, however Barish-stern would be responsible to pay a re-instatement fee of $35.00. Francine Bray disputed this request, especially since STARTLOGIC was at fault for entering into a false contract, and for compounding that error, by shutting down the Barish-Stern website and preventing any access to files. Francine Bray again contacted Marie in billing and the $35.00 was no longer required, but now,  Barish-Stern was falsely informed by STARTLOGIC that in order to reactivate the website and its files, STARTLOGIC required Barish-

Stern to reinstate the $300.00 credit card cancellation charge. They would then make the site operational and would put in for a credit of the $300.00 charges. This was unacceptable for Barish-Stern.

19. Relying upon STARTLOGIC's demand, Barish-Stern's Francine Bray contacted Chase Credit Card services, and was informed that if Barish-Stern reversed the cancelled charge and STARTLOGIC never issued a refund, Chase would no longer be able to intercede.

20. Barish-Stern again contacted STARTLOGIC with a request to relinquish the site, but such requests were never replied to. STARTLOGIC technical support escalated the problem as STARTLOGIC again falsely kept Barish-Stern from moving the site to another host or having any access to any of the data, including the website name.

21. By July 2007 with the site still closed, STARTLOGIC automatically charged to the same credit card an additional yearly hosting fee of $35.00.

22. Barish-Stern then received a communication from Chase Credit Card Disputes that STARTLOGIC was disputing the chargeback.

23. Barish-Stern demonstrated its continuing good faith efforts and tried to resolve the issue with STARTLOGIC. STARTLOGIC consistently refused to acknowledge responsibility for the problems it was causing Barish-Stern. In addition, Barish-Stern was losing business from its store customers that could not find the web-site on the internet. STARTLOGIC did not post any reasons, re-direct, email for customers convenience or any other customer service message and as STARTLOGIC restricted all Barish-stern access there was no possible way to alert customers and many determined we were out of business.

24. Based upon STARTLOGIC's actions, Barish-Stern was no longer able to provide an internet location for new wholesale customers to view collections and see custom products before they were purchased, and that ultimately resulted in a loss of new business. Barish-Stern also lost other business as the other web sites all had links to www.artongoldgallery.com which no longer worked, and now led to nowhere, with no reason or explanation.

25. In late October, 2007 Barish-Stern received a response from Chase stating that the dispute was followed up and further investigated and they found in Barish-Stern's favor, and the chargeback would stand.

26. Immediately, Barish-Stern made provisions to transfer the site to another host provider, and requested that STARTLOGIC release the site. Barish-Stern, in an attempt to make the transfer it was discovered that STARTLOGIC had "Locked" the site. The error message for the transfer read: "The domain submitted could not be found. Contact your domain registration company for further assistance."

27. Barish-Stern once again attempted to reasonably request that STARTLOGIC unlock the site. After waiting seventy-six minutes, "76" in a conversation with STARTLOGIC representative, Nikitas, we were informed that the site had expired on November 15th. We reiterated that in July 2007 STARTLOGIC charged our credit card for one years hosting fees and were advised to try and speak to a supervisor.

Ultimately, after repeated efforts by Barish-Stern, on its own behalf, Barish-Stern was finally able to speak to Chad a supervisor who knew nothing of us, or our site. He would investigate and advise, however he never called back.

Barish-Stern, then called again and this time Chad advised that the site would be unlocked and working by close of business, November 30, 2007.

Again, after numerous efforts of calling each day and never receiving a call back, we finally gave up on ever getting our property back and tried to transfer just our internet web site name: www.artongoldgallery.com to the new hosting company. The results were an error message that stated, "Access denied for user."

Barish-Stern had now wasted over ten (10) months back and forth with STARTLOGIC to regain their property which STARTLOGIC illegally absconded with and even after they admitted wrong doing in entering into a contract falsely, they persisted in using un-businesslike tactics that held Barish-Stern's property for ransom, and ultimately caused the reputation, and loss of the internet name, www. artongoldgallery.com

28. The time that Barish-Stern was required to wait for a response in each instance from STARTLOGIC has been extraordinarily excessive because, *inter alia*, in addition to failing to provide adequate personnel to address the serious issues related to this web-site closure and preventing Barish-Stern access to their property, even though the proper hosting charges were in turn paid for until May 2008, STARTLOGIC also caused the need for Barish-Stern to obtain a new web-site name, causing great damage to their business continuance, and to invest hundreds of additional man hours to begin to rebuild over 160 pages and over 10,000 items. Without the files from the original web-site, which STARTLOGIC continued to restrict access to, Barish-Stern had to re-design, re-invent, and re-construct an entirely new web-site and structure. STARTLOGIC's delay and apparent inability to, *inter alia*, release and unlock the domain name and release and unlock all files, as had been agreed upon by the parties. Of course, the limitations and delays created by STARTLOGIC's acts and omissions required Barish-Stern to perform and re-perform any and all efforts regarding their internet business, despite the persistent obstacles imposed by STARTLOGIC.

29. To make matters even worse, because STARTLOGIC closed Barish-Stern's web-site, their placement on search engines, a task that required many man hours to achieve, a previous listing on the first page of Google, Yahoo, and a high page ranking with them and many other major search engines, now required Barish-Stern to make an extraordinary efforts to restore such position for the "new" web-site and new name: www.artongoldcreations. The result was the loss of over 7 years of efforts to build a web presence.

30. Barish-Stern also regularly has been forced to wait on hold for forty-five (45) minutes plus, each time that it contacted STARTLOGIC in an attempt to resolve all of these issues and the myriad of issues that Barish-Stern had faced in its dealings with STARTLOGIC over the past six (11) months. In addition, although STARTLOGIC consistently had advised Barish-Stern that someone was checking into the issues, and would contact Barish-Stern they never did. When Barish-Stern contacted STARTLOGIC to pursue these customer service issues, it consistently had been advised that STARTLOGIC's personnel either knew nothing about the situation or as a result, Barish-Stern has been regularly forced to re-explain each issue to STARTLOGIC's representatives in hopes that they could help resolve

the problems, or reach a customer service representative who could. In summation, based upon its dealings with STARTLOGIC during this period, Barish-Stern concluded that, as a matter of business practice, STARTLOGIC deliberately chose to ensure that service providers, customers and others legitimately seeking customer or technical support from STARTLOGIC be forced to endure a lengthy period of time "on hold" and otherwise are frustrated in attempting to obtain customer service in order to discourage these parties from raising legitimate grievances with STARTLOGIC and insisting upon a modicum of customer service and responsiveness.

31. As a result of STARTLOGIC's misconduct, Barish-Stern has been forced to devote hundreds of hours in time attempting to fix problems which resided in STARTLOGIC's personnel being incapable or unwilling to assist Barish-Stern in getting access to their property from the outset. As a result, Barish-Stern has suffered the direct loss of hundreds of hours of billable work that would have been performed for other customers, as well as other related damages.

32. Barish-Stern's experience with STARTLOGIC has neither been unique nor, in any respect, out of the ordinary. Instead, upon information and belief, since STARTLOGIC's creation in 2003, as a result of excessive cost cutting and a policy and practice by STARTLOGIC of ignoring customer service in an effort to concentrate its efforts on boosting short-term sales and revenues, hundreds (if not thousands) of customers have been victimized by the same or similar conduct perpetrated by STARTLOGIC as that described above.

**ACTION ALLEGATIONS**

33. Plaintiff alleges breach of contract by the defendant as follows:

Barish-Stern Ltd. located in the State of Virginia, contracted with or otherwise relied upon STARTLOGIC to perform services that have suffered damages as a inability to fulfill a contractual agreement, breach of contract, infringement of intellectual property and theft of personal property resulting from STARTLOGIC's work ethics, and/or STARTLOGIC's persistent failure to provide timely, attentive and responsible customer service and technical assistance, including, but not limited to, having been deliberately placed "on hold" by STARTLOGIC as part of a policy and practice by STARTLOGIC to discourage, customers and others legitimately seeking customer or technical support from raising legitimate grievances with STARTLOGIC and insisting upon customer service from STARTLOGIC.

The Action Period is defined as follows: from June 1, 2006 until the conclusion of this case.

34. Plaintiff seeks damages, including punitive damages, and equitable relief on its own behalf.

35. Plaintiff expressly disclaims any intent to request in this suit any recovery for personal injuries suffered.

36. Plaintiff further alleges violations under the Virginia Deceptive Trade Practices Act and asserts that the defendant violated, among other things the common law of Virginia, and ethics and established proper business practices regarding doing business on the Internet and United State Copyright Act;

37. **COUNT I**

**Violations of VA**

38. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein at length.

39. STARTLOGIC's acts and omissions described herein constitute unfair and deceptive trade practices, in violation of Virginia Deceptive Trade Practices Law and ethics and established proper business practices regarding doing business on the Internet and United State Copyright Act. .

40. STARTLOGIC's policies, practices, acts and omissions herein were and are violative of public policy, unfair, unethical, oppressive, unscrupulous and have caused substantial injury to consumers, including Plaintiff.

41. The conduct of STARTLOGIC was and is fraudulent, unfair or unlawful within the meaning of Virginia Deceptive Trade Laws and ethics and established proper business practices regarding doing business on the Internet and United State Copyright Act.

42. As a result of Defendant's fraudulent and unfair business practices, and unfair, deceptive, or untrue representations, Plaintiff has suffered ascertainable losses within the meaning of the law, and have been damaged by Defendant's unlawful acts and omissions.

44. Defendant's fraudulent and deceptive acts and practices present an ongoing threat and likelihood of deception to the public and constitute a fraud upon the members of the public, as well as unfair, unlawful and deceptive acts, in violation of Virginia Deceptive Trade Practices Law and ethics and established proper business practices regarding doing business on the Internet and United State Copyright Act.

45. Under all of the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was and is cruel, brazen and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

46. At all pertinent times, in violating Virginia Deceptive Trade Practices Law and ethics and established proper business practices regarding doing business on the Internet, and United State Copyright Act. Defendant acted intentionally or, at a minimum, with reckless disregard for Plaintiff's rights.

47. Plaintiff brings this claim on behalf of itself for damages, including injunctive relief and restitution, as well as disgorgement of Defendant's profits obtained by virtue of its unfair trade practices, and punitive damages.

48. As a result of Defendant's fraudulent and deceptive trade acts and practices, Plaintiff has suffered injuries and been damaged.

**COUNT II**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

49. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein at length.

50. Defendant owed the duty of good faith and fair dealing to Plaintiff as a result of their status as parties that have contracted with STARTLOGIC.

51. Defendant breached the duty of good faith and fair dealing it owed to Plaintiff by engaging in bad faith conduct in degradation of its duties to Plaintiff.

52. As a direct and proximate result of Defendant's bad faith conduct, Plaintiff has suffered injuries and damages.

**COUNT III**

**Unjust Enrichment**

53. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein at length.

54. In the alternative, Plaintiff conferred benefits upon Defendant which resulted in Defendant being unjustly enriched and which Defendant wrongfully retained.

55. Under all of the circumstances, Defendant should be required to return and disgorge the benefits conferred upon it by Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Barish- Stern Ltd. on its own behalf and that of the general public, prays for judgment against Defendant, Startlogic Corporation as follows:

   a. For all damages recoverable by Plaintiff in an amount in excess of $ 500,000, as well as for all other appropriate relief as determined by the Court consistent with Virginia Trade Practices Law and ethics and established proper business practices regarding doing business on the Internet, and the Court's inherent equitable powers, including punitive damages and mandatory injunctive relief requiring Defendant to cease and desist from its unlawful conduct and to remedy its violations of Virginia Trade Practices Law and ethics and established proper business practices regarding doing business on the Internet,;

   b. For payment of, costs of suit and all other recoverable expenses of litigation;

   c. For both pre- and post-judgment interest on any amounts awarded; and

   d. For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: June 1, 2007

Respectfully submitted,

_____ 11/20/2009
Francine R. Bray

Francine R. Bray
PO Box 83
Troutville, VA 24175
(Tel) (540) 254 – 3183
(Fax) (917) 591 – 9023
Counsel for Plaintiff
Pro Se